Nathan D. GOLDBERG and S. E. Wood, Jr.

v.

COMMISSIONER OF INTERNAL REVENUE.

No. 15317.

United States Court of Appeals Fifth Circuit.
June 21, 1955.

Tom B. Rhodes, Geo. S. Atkinson, Dallas, Tex., for petitioners.

S. Dee Hanson, Ellis N. Slack, Hilbert P. Zarky, Alonzo W. Watson, Jr., Sp. Assts. to Atty. Gen., H. Brian Holland, Asst. Atty. Gen., Daniel A. Taylor, Chief Counsel, and Charles E. Lowery, Sp. Atty., Internal Revenue Service, Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

The sole question presented in these petitions for review is the propriety of the Tax Court's finding of fact that 90 houses sold by Pinecrest Housing, Inc., in 1946, were then held primarily for sale to customers in the ordinary course of trade or business. The Tax Court, in an opinion reported at 22 T.C. 533, held the petitioners liable as transferees, for a corporation income tax deficiency for 1946, redetermined against Pinecrest on the ground that the $58,675.41 profit realized on the sales of the houses, and reported by it as a capital gain, was taxable as ordinary income. Since petitioners admit they are transferees of the assets of Pinecrest, the decision of the Tax Court must be affirmed unless it was clearly erroneous in its finding that the houses were in 1946 held primarily for sale to customers in the ordinary course of trade or business. 26 U.S.C. § 117(j) (1) (B) (1946 Ed.).

The following statement of facts, being in substance taken from the brief of the respondent, fairly presents the evidence relied on as supporting the Tax Court's decision:

Pinecrest was incorporated under the laws of Texas in 1943, "to erect, construct, or repair any building or improvements, and to purchase, sell, rent, subdivide, and improve real property in towns, cities, villages and their subdivisions * * *." The 2,000 shares of $10 par value stock were owned as follows: S. E. Wood, Jr., and James B. Cheek, 667 shares each; Marion F. Fooshee, 666 shares. In 1943 the corporation had 111 housing units constructed in Marshall, Texas, these being two- and three-bedroom houses. At that time there was an acute need of housing in the area because of the influx of defense workers. The project was financed by an insurance company, upon the Federal Housing Administration guaranty to the extent of 90 per cent of the project's appraised value. The guaranty was conditioned on design of the houses for residential rental by war workers, and Pinecrest indicated in its application to the F.H.A. that

they would be used for rental. Under the F.H.A. regulations, Pinecrest could sell the houses at a ceiling price fixed by F.H.A. to war workers who had occupied the premises four months and who agreed in writing to continue occupancy for a specified period after purchase. Effective September 10, 1945, the restrictions on sales were revoked as to housing then or thereafter vacant, provided the vacancy had not been created by eviction and that a maximum authorized sales price had been established for the housing to be sold.

In April 1944, the corporation having difficulty meeting its mortgage payments because of insufficient rental income, shareholders Cheek and Fooshee sold their stock to petitioners so as to make each the owner of 50 per cent of the stock. Pinecrest was also granted a one-year delay in making payments on the mortgage and a reduction of interest thereon. By the end of 1944, rental income increased and Pinecrest resumed full current payments on the mortgage. It reported operating losses on rentals in each of the four years of its existence, 1943 and 1946, although by the end of 1945 the housing units were almost fully occupied. However, profits were realized from the sale of houses in each of these years; in 1943, $134.50 from the sale of two houses; in 1944, $698.83 from the sale of two houses; in 1945, $7,642.16 from the sale of 17 houses and a vacant lot; and in 1946, the year in question, $58,675.41 from the sale of 90 houses. Most of the 1946 sales were to tenants, many of whom were war veterans. Property sales were handled by petitioner Goldberg, whose office received $100 a month from 1944 to 1946 for keeping Pinecrest's rental and sales records. Sales of the houses were not advertised, but their availability for sale was made known by word of mouth; no "for sale" signs were put up; no salesmen were

hired; and no commissions were paid on the sales. In 1946 there was a heavy demand for housing in the area. The corporation was dissolved in December, 1946, and petitioners divided all the corporation's assets equally. Petitioner Wood, president of Pinecrest, was an automobile dealer from 1919 through 1949, was not in the business of buying and selling real estate, and did not have a real estate dealer's license, though he occasionally sold a parcel of real estate. Petitioner Goldberg, vice president of Pinecrest, was a real estate agent with 26 years' experience.[1] Before 1944 his principal activity was managing properties for others, but he occasionally sold properties for others on commission.

On these facts, the Tax Court found that although petitioners went into business for the purpose of building houses for rental, by the beginning of 1946 the nature of the corporation's business had been changed to selling houses; therefore, that the profit realized from sales in 1946 was taxable as ordinary income and not as capital gain.

■ First, as to the scope of the review which we may make of the Tax Court's finding that the houses were held during the taxable year for sale to customers in trade or business, we reaffirm all that we said on the subject in our recent case of Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217, 219. As Judge Rives expressed the principle applicable to the decision of the present case, as we conceive it:

"Insofar * * * as the so-called 'ultimate fact' is simply the result reached by processes of legal reasoning from, or the interpretation of the legal significance of, the evidentiary facts, it is 'subject to review free of the restraining impact of the so-called "clearly erroneous" rule.' Lehmann v. Acheson, 3 Cir., 206 F.2d 592, 594. As succinctly

---

1. The Tax Court found that Goldberg was a "dealer," but the only evidence in the record showed that he "was engaged in the general real estate business of handling sales, lease rentals and trades; that property management or rentals for other people occupied most of his time." There is no evidence that he bought and sold property on his own account as a business.

stated by Professor Moore, 'Findings of fact that are induced by an erroneous view of the law are not binding. Nor are findings that combine both fact and law, when there is error as to the law.' 5 Moore's Federal Practice, 2d Ed., Sec. 52.03 (3) * * *."

We are convinced that the finding of the Tax Court was the result of an erroneous view of the law, and proceed now to state our view of the substantive law involved.

Like other courts, we have had frequent occasion to consider this matter. Dunlap v. Oldham Lumber Co., 5 Cir., 178 F.2d 781; Fahs v. Crawford, 5 Cir., 161 F.2d 315; Lobello v. Dunlap, 5 Cir., 210 F.2d 465; and Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217, are several of the leading cases in this circuit. Since the cases are so numerous, and since practically every judicial discussion involves the particular combination of facts present in the case, it is difficult to review them in brief. But the cases follow a consistent pattern and line of reasoning; and although the courts are fond of saying that each case depends on its particular facts, we may set out some objective principles which they uniformly follow.

In the typical case it is clear that the property owner did not intend to engage in the business of buying and selling real estate when he acquired or developed it, but on the contrary intended only to rent it. At the time he may have been restrained from selling by wartime legislation or the terms of a government loan. But years later, his intention changes or the government restrictions are removed, and he proceeds to sell the property. The test as to whether the capital gain provisions apply in such event is, at bottom, whether the purpose of the sales is primarily making money by carrying on a substantial part of the activities of a person engaged in the business of selling houses, or to dispose of or liquidate the rental business. If the latter is the case, the owner obtains capital gain benefits.

A significant matter in determining whether the purpose is liquidation of a business is, of course, whether, considering the objective evidence, the owner ever intended to operate a rental business in the first place. If the property was originally acquired for rental purposes, it may nevertheless later be held for ordinary business sale to customers; and the converse may also be true. But the original purpose is important, for to counterbalance it there must be significant objective evidence of a change in that purpose.

The frequency and continuity of sales is also important. If a rental corporation's assets are sold in a single transaction to a single purchaser, it could not be reasonably contended that there was a sale to a customer in the regular course of business. But more often the owner sells his rental properties piecemeal to different individuals. How frequent the sales are depends on many circumstances; the extent to which the seller turns his talents to the promotion and solicitation of sales, the number of units in the rental project, and the state of the market. Only the first of these circumstances has any rational connection with the question whether the owner has changed his business to selling, or is simply liquidating his business. Thus the frequency and continuity of sales factor is significant only so far as it reasonably justifies the conclusion that the owner somehow promoted the sales. The courts do not deny capital gain benefits simply because a large number of sales are made in a short period; for if the owner has a large number of houses on a seller's market, it is quite possible that he may sell them continuously without any sales promotion or solicitation.

It seems that appellate courts have quite generally upheld the finding by the trier of fact that the owner was a dealer, where the evidence showed that he himself devoted his energies and talents to substantial promotional, advertising, or sales techniques ordinarily associated with real estate dealers. Furthermore, if the owner was contemporaneously, or

soon before or after, buying or selling other properties on his own account as a dealer, appellate courts have found that this evidence supported factual findings resulting in the denial of capital gain benefits with respect to the rental properties in question.

Now, let us apply these principles to the facts of the present case. The Tax Court found as a fact, and we agree, that petitioners bought the property for rental as residential property. Later they decided to sell it in individual sales. That fact points to a liquidation of capital with as much persuasiveness as to sale as a money-making activity. The sales were frequent and continuous; but since the circumstances were favorable to selling to individuals and the project was a large one, this is entirely consistent with liquidation of it as an investment. Indeed, the evidence that is in the record indicates that disposing of the property, not making money from a new type of business, was the primary purpose. Petitioners introduced uncontradicted evidence that Pinecrest sold the houses at established F.H.A. prices, although ceiling prices had been lifted and the houses could have been sold for considerably more. There was absolutely no evidence of any promotional activity or that petitioners used the proceeds to buy and sell other houses. The fact that the rental business had been unprofitable, to which the Tax Court attached such significance, is fully as consistent with a decision to liquidate the property opportunely, as to turn it into another more profitable type of business.

In short, the only evidence that the corporation was engaged in the business of selling real estate was the frequency and continuity of sales, and this for a comparatively short time. Under the circumstances, the fact was equivocal, and that fact alone is not sufficient to support a finding of the ultimate fact that Pinecrest was engaged in selling houses as a business. We conclude that the Tax Court's finding was based upon an erroneous application of the law. Lobello v. Dunlap, 5 Cir., 210 F.2d 465;

Dunlap v. Oldham Lumber Co., 5 Cir., 178 F.2d 781; United States v. Robinson, 5 Cir., 129 F.2d 297; Victory Housing No. 2 v. Commissioner, 10 Cir., 205 F.2d 371.

The Tax Court relied, and respondent relies, principally on the case of King v. Commissioner, 5 Cir., 189 F.2d 122, certiorari denied 342 U.S. 829, 72 S.Ct. 54, 96 L.Ed. 627; Rollingwood Corp. v. Commissioner, 9 Cir., 190 F.2d 263; Home Co. v. Commissioner, 10 Cir., 212 F.2d 637; and Winnick v. Commissioner, 21 T.C. 1029, affirmed 6 Cir., 223 F.2d 266. But all of these cases involved some further circumstance indicating the property was held for sale to customers as a business. In King [189 F.2d 123], the evidence showed that the taxpayer made "earnest and strenuous efforts to so sell" the houses. In Rollingwood [190 F.2d 264], Bohannon, the sole stockholder of the corporation during the taxable year, had prior to that time engaged in "the business of subdividing and selling real property". In Home Company, there was an active sales campaign and extensive advertising. In Winnick, the taxpayer was in the business of building and selling houses (other than the ones in question) during the taxable year, and had been for a period of seven years. These cases are distinguishable, for here there was no evidence at all of any activities that would indicate the conduct of business of selling houses as distinguished from liquidating a rental business as rapidly as possible consistent with a desire to realize the benefits of individual rather than bulk sales. Moreover, it is to be remembered that neither the corporation nor petitioner had ever engaged in the business of selling real estate held by himself. Goldberg's occupation of managing the properties of others and making sales for others on commission was quite obviously not the same as dealing in real estate on his own account.

The judgment is reversed and the case remanded for entry of judgment in favor of petitioners.