**ALABAMA MINERAL LAND COM-
PANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 16439.

United States Court of Appeals
Fifth Circuit.

Dec. 30, 1957.

John R. Stivers, Memphis, Tenn., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, John N. Stull, A. F. Prescott, Carolyn R. Just, Attys., Dept. of Justice, John Potts Barnes, Chief Counsel, John M. Morawski, Sp. Atty., I. R. S., Washington, D. C., for appellee.

Before RIVES, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

Six individuals owned the bonds of a $5,000,000 issue of Selma, Rome and Dalton Railroad Company secured by its deed of trust. Through foreclosure the bondholders acquired approximately 361,-000 acres of land situate in fifteen or more counties of Alabama. In 1883 the six former bondholders transferred the lands to the petitioner, Alabama Mineral Land Company, in exchange for its stock. The stock was issued in the same proportion as the bonds had been held. Prior to March 1, 1913, the petitioner had sold about 163,000 acres of land so that on that date it had about 198,000 acres remaining. During 1943 and 1944 the petitioner, as it had done before and as it has done since, made sales of land and made dispositions of timber, coal and mineral rights. These transactions were reported by the petitioner in its Federal income tax returns as sales of capital assets and the tax on the profits was computed as long-term capital gains. The Commissioner of Revenue determined that these profits were ordinary income and proposed tax deficiencies. The Tax Court reached the same conclusion in a memorandum opinion. The correctness of this determination, among other issues, is presented to us for review.

In the Tax Court's opinion it is stated that the petitioner acquired the property from the bondholders, who became the petitioner's stockholders, for the purpose of selling it, and that it never deviated from that purpose. Therefore, the Tax Court concluded, it was regularly engaged in the business of selling its properties and the properties were held for sale in the ordinary course of trade or business. 26 U.S.C.A. (I.R.C.1939) § 117. The evidence shows that the property was not acquired through a voluntary purchase for the purpose of reselling in smaller parcels. It was taken over in foreclosure and replaced bond holdings which had been acquired as investments. Realization upon the investment required that the property be sold. There was no substantial sales promotion or activity. It sold timber, coal and mineral rights but did no logging, mining or exploring. In Alabama Mineral Land Co. v. Commissioner, 28 B.T.A. 586, decided in 1933, the Board of Tax Appeals said that the petitioner was engaged in the business of buying and selling timber, timber lands and cut-over lands. However, there is nothing in the record before us to show land purchases after the 1883 acquisition except one small tract acquired for blocking out its holdings, nor were any timber purchases shown since the Board's decision. The acquisition by the bondholders was for the purpose of liquidation. The transfer to the corporation did not endow it with a different purpose. Proceeds of sales have been distributed in liquidation.

■■ The Commissioner calls to our attention the charter powers of the petitioner to improve, develop and sell the lands acquired in the foreclosure and to acquire other property for use, improve-

ment, development and sales. Our concern, though, must be with what it did rather than with what it might have done. The exercise of a power and not the possession of it is the material factor to be weighed in testing whether a corporation is in a particular business. See South Texas Properties Co. v. Commissioner, 16 T.C. 1003. Frequency and continuity of sales are matters for consideration in ascertaining whether sales are of assets held for sale in the ordinary course of trade or business but are not necessarily controlling. Goldberg v. Commissioner, 5 Cir., 1955, 223 F.2d 709.

■ On other occasions this Court has reviewed the tests which have been applied in determining whether property has been held for sale in the ordinary course of trade or business. See Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353, and Gamble v. Commissioner, 5 Cir., 1957, 242 F.2d 586, and the cases there cited. From all of the decisions it is apparent that there is not any fixed formula that can be used, and that each case must rest upon its own facts. This is the rule in cases involving liquidation of properties as in other cases. Taxpayers have been denied capital gain or loss treatment of liquidations by decisions of this Court in Snell v. Commissioner, 5 Cir., 1938, 97 F.2d 891; Brown v. Commissioner, 5 Cir., 1944, 143 F.2d 468; and in White v. Commissioner, 5 Cir., 1949, 172 F.2d 629. In other Fifth Circuit cases the right to treat liquidations on a capital gain basis has been sustained. See United States v. Robinson, 5 Cir., 1942, 129 F.2d 297; Goldberg v. Commissioner, 5 Cir., 1955, 223 F.2d 709; Consolidated Naval Stores Company v. Fahs, 5 Cir., 1955, 227 F.2d 923. In the case of Snell v. Commissioner, supra, the taxpayer had platted the property and improved it in order to make it the more saleable. The reason for denying the use of the capital gain tax rate was thus stated by the Court:

"The fact that he bought no additional lands during this period does not prevent his activities being a business. He merely had enough land to do a large business without buying any more. He was not reselling land in the condition in which he bought it, but was subdividing and platting it and sometimes improving it, so as to make wild lands into town lots, thus adding the business element of development. All was done with such purpose, system and continuity as well to constitute it a business." Snell v. Commissioner, 5 Cir., 97 F.2d 891, 893.

Upon similar facts the Court reached a like conclusion in Brown v. Commissioner, supra, where the opinion adopts the language we have quoted.

■ Where, as here, a liquidating landowner has engaged in disposing of its property without having platted, subdivided or made improvements upon it, and without having advertised it for sale, listed it with brokers or employed sales agents, it was not in the trade or business of selling real estate. Rather it was in the course of gradual and passive liquidation, and sales made in following such a course are sales of capital assets. This is so even though sales have been frequent and continuous. Such is the holding of the Tax Court in Farley v. Commissioner, 7 T.C. 198, which this Court has cited with approval in White v. Commissioner, supra. The Tax Court, in its Farley opinion, cited the opinion of this Court in United States v. Robinson, supra, where timber sold in liquidation was held to be a capital asset rather than stock in trade.

Of the reported cases bearing upon the capital gains question the one nearest in point on its facts is Chandler v. United States, 7 Cir., 1955, 226 F.2d 403. The facts were that the State of Texas had conveyed some 3,000,000 acres of land to a British corporation as payment for constructing the State capital building. The titles came to Chandler and others as trustees under a declaration of trust which contemplated liquidation. There as here it was contended that the capital of the trust had been embarked upon a full scale real estate business. Following its earlier decision in Three States Lumber

Co. v. Commissioner, 7 Cir., 1946, 158 F. 2d 61, it was held that the property sold was not held for sale to customers in the ordinary course of trade or business.

The quantity of the land owned by the petitioner and the fact that it was checkerboarded rather than in large tracts required time within which to dispose of it. The length of time required for liquidation and the number of transactions necessary are not determinative of the issue of selling in the course of business. Consolidated Naval Stores Co. v. Fahs, supra; Three States Lumber Co. v. Commissioner, supra; Chandler v. United States, supra.

The material facts were not in dispute on the issue of whether the sales were in the course of business. Although the issue is one of fact, it is of the ultimate fact which we may with propriety review under the rule stated in Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217. And see Consolidated Naval Stores Co. v. Fahs, supra. We conclude that the sales of land, timber and mineral rights made by the petitioner during the years in question were not of property held primarily for sale to customers in the ordinary course of trade or business.

In the second of the two questions presented by this appeal, the petitioner challenges the Tax Court's findings as to the unrecovered March 1, 1913, value of the timber owned on December 31, 1941. The amount was claimed by the petitioner in its Tax Court petition to be not less than $908,844. It here claims such unrecovered value was $1,831,188. The Commissioner, in determining the petitioner's tax liability, assigned $33,256, as the unrecovered 1913 value of timber owned on December 31, 1941. The amount found by the Tax Court is $118,188. There was no dispute as to the amount of the recovery from March 1, 1913, to December 31, 1941. The difference in amount unrecovered is the result of disagreements as to the 1913 value of the timber owned in 1941. The disagreements are both as to the quantity of timber and as to the value

per M board feet to be placed upon it. The Board of Tax Appeals, in the 1933 case involving 1928 and 1929 tax deficiencies, found that the timber there involved had a March 1, 1913, value of $5 per M board feet. Alabama Mineral Land Co. v. Commissioner, supra. In that case the $5 figure was established by petitioner's witnesses and the Tax Court pointed out that the Commissioner "offered no rebuttal evidence and failed to weaken the testimony of petitioner's witnesses by cross-examination or otherwise". In the trial of this case before the Tax Court the Commissioner produced testimony of several witnesses, some who knew the land and its history firsthand and some who qualified as experts in the field of timber appraising. There was a conflict of the testimony and the evidence fully justified the Tax Court in the finding which it made. The requirements of the Treasury Regulation for the determination of the value of timber were followed. Treas.Reg. 111, § 29.23(m)–25. The petitioner asserts that it was entitled to have its timber aggregated in a "block" for determining the unrecovered March 1, 1913, value of the timber held on December 31, 1941, and contends that its right to such method of valuation is given to it by Treasury Regulation 111, § 29.23 (m)–27. This regulation provides:

"With a view to logical and reasonable valuation of timber, the taxpayer shall include his timber in one or more accounts. In general, each such account shall include all of the taxpayer's timber which is located in one 'block', a block being an operation unit which includes all of the taxpayer's timber which would logically go to a single given point of manufacture. In those cases in which the point of manufacture is at a considerable distance, or in which the logs or other products will probably be sold in a log or other market, the block may be a logging unit which includes all of the taxpayer's timber which would logically be removed by a single logging development. * * *"

We do not outline the evidence upon which the petitioner relies in putting forward this claim. It is enough for us to say that the evidence furnishes no basis for a blockage method of valuation. See 4 Mertens, Law of Federal Income Taxation, p. 135, § 24.43.

The decision of the Tax Court is reversed and the case is remanded for a redetermination of the tax deficiency in conformity with this opinion.

Reversed and remanded.

RIVES, Circuit Judge (dissenting).

I think that the decision of the Tax Court should be affirmed. Under the applicable Section 117 of the Internal Revenue Code of 1939, "The term 'capital assets' * * * does not include * * , * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." During the taxable years 1943 and 1944, the principal business of the taxpayer corporation was the sale of real property, timber and minerals. Nevertheless, according to the present decision, gain from the sale of its properties is saved from taxation as ordinary income because sometime prior to 1883 its original incorporators had invested in bonds of the Selma, Rome and Dalton Railroad Company, and their purpose in creating the taxpayer corporation was to salvage their investment in those bonds.

Not just one liquidation, but several successive liquidations are involved. The Selma, Rome and Dalton Railroad Company was beset with financial difficulties, and, after protracted litigation extending from 1872 to 1883, the mortgages securing its bonds were foreclosed and the mortgaged lands were conveyed to representatives of the bondholders. The taxpayer corporation was then organized in 1883 and the representatives of the bondholders of the defunct railroad company conveyed to it the lands in exchange for the 10,000 shares of the capital stock of the taxpayer corporation of the par value of $100.00 per share, which were issued to the former bondholders in proportion to the amount of bonds owned by each.

Thus the investment in the bonds had been converted into real property, and then the real property had been exchanged for shares of capital stock of the taxpayer corporation.

The record does not show that any of the original bondholders owned stock in the taxpayer corporation during the taxable years 1943 and 1944, or, in fact, for many years prior thereto. Realization upon their investment did not have to await the more than three score years during which the property conveyed by them to the taxpayer corporation was being sold by it, because whenever they saw fit they could transfer and assign their shares of the capital stock of the taxpayer corporation.

It seems to me that the Tax Court soundly answered the taxpayer's contention when it said:

"Petitioner's argument that its sale of land, timber, and mineral properties over three-quarter of a century was a liquidation presupposes the existence of a fact which is at complete variance with the record herein; namely, that petitioner originally acquired its properties for purposes of investment and not for sale. That, of course, was not the case. The bondholders of the railroad may have used petitioner as the vehicle for 'liquidating' their large land holdings, but petitioner, itself, was a separate taxable entity. It acquired the land from the bondholders for the purpose of selling it, together with all timber and mineral rights appurtenant thereto; and from 1883 to the date of the hearing, it never deviated from that purpose. It was, therefore, from the date of its incorporation, regularly engaged in the business of selling its properties, which was the purpose for which it was formed. All of its properties were its stock in trade, held for sale in the normal course of its business, and all gains derived therefrom are taxable to it as ordinary income."

The failure of the Selma, Rome and Dalton Railroad Company during reconstruction days in Alabama and Georgia, the tenacious efforts of its six bondholders to recoup their losses, whether they were of Scotch ancestry, their close association in the acquisition of the lands of the defunct railroad and the original incorporation of the Alabama Mineral Land Company to the exclusion of any carpetbagger agents of northern speculators, whether they retained or sold their stock, what happened to it in the hands of their descendants or assignees,—all of these are matters of much human and historical interest; but they do not change the character of the business of the taxpayer corporation in the years 1943 and 1944 from that of selling the extensive properties held by it primarily, if not solely, for sale to customers in the ordinary course of its trade or business.

It seems to me that the taxpayer cannot overcome the difficulties presented by the properties having passed through the hands of three separate legal entities (treating the six bondholders as one): first the defunct railroad, then the bondholders, and then the taxpayer. It might be said, however, that the substance of the transactions was the same as if the bondholders had succeeded to the stock of the defunct railroad company and had used that company as the vehicle for liquidation. The short answer, of course, is that that did not occur, and what actually took place governs the tax treatment.

If, however, the defunct railroad company had itself undertaken to liquidate its lands by engaging over the years in the essentially separate business shown by the facts of this case, I would think that it had lost its preferred tax status. As said in Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217, 220:

"Congress intended to alleviate the burden on a taxpayer whose property has increased in value over a long period of time. When, however, such a taxpayer endeavors still further to increase his profits by engaging in a business separable from his investment, it is not unfair that his gain should be taxed as ordinary income."

Compare Baker v. Commissioner of Internal Revenue, 5 Cir., 248 F.2d 893.

The Supreme Court has recently said that:

" * * * Since this section [117] is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose."

Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29.

With deference, it seems to me that the majority goes to the opposite extreme.

I therefore respectfully dissent.